IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH PARTICULAR CELL TOWERS PERTAINING TO A SPECIFIED LOCATION OF INTEREST THAT IS STORED AT A PREMISES CONTROLLED BY AT&T | Case No. 1:23-mj-270 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Randy Larkin, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a warrant for records and information associated with certain cellular towers ("cell towers") that are in the possession, custody, and/or control of AT&T, a cellular service provider headquartered at 11760 US Highway 1, Suite 600, North Palm Beach, Florida 33408 (hereafter the PROVIDER). The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require PROVIDER to disclose to the government the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Special Agent with the FBI and have been since September 2015. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure

1

41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am currently assigned to the Minneapolis Division, Williston, North Dakota Resident Agency, of the FBI. I am tasked with investigating a number of criminal offenses including the investigation of drug trafficking organizations, complex financial crime, violent crime and assault within boundaries of Native American Indian Reservations, and crimes against children relating to material involving the sexual exploitation of minors. I have conducted or participated in physical and electronic surveillance, interviewing subjects, witnesses, and victims, the execution of search warrants, arrests, and utilizing informants for controlled narcotics purchases. I hold a master's degree in Information Security and Computer Technology. Through my training, education, and experience, I have become familiar with cell phone communications and stored evidence on cell towers.

3. I am submitting this affidavit in support of a search warrant authorizing a search for the records and information, stored through the normal course of business, by the PROVIDER to support the joint FBI and Williams County Sheriff's Office (WCSO) investigation of the destruction of an energy facility, namely the Wheelock Substation, in Ray, North Dakota.

4. There is probable cause to believe that violations of Title 18, United States Code, Sections 1366 and 922 (Destruction of an Energy Facility and Firearms Offenses), have been committed, as more fully detailed herein. I am requesting authority to search the information described in Attachment A for evidence of these offenses as further described in Attachment B.

5. The statements contained in this affidavit are based in part on information provided to me from Williams County Sheriff's Office (WCSO) detectives and other law

enforcement officers. This affidavit is being submitted for the limited purpose of establishing probable cause. I have not included every detail of the investigation. In addition, unless otherwise indicated, all statements contained in this affidavit are summarized in substance and in part.

## PROBABLE CAUSE

6.      On May 13, 2023, WCSO deputies were dispatched to the Wheelock Substation, located in Ray, North Dakota. This facility is an electric power substation and is operated by Mountrail-Williams Electric Cooperative and Basin Electric Power Cooperative. Employees at the substation stated they responded to the substation on May 13, in the morning, after alarms indicated that equipment was not working. Once the employees arrived at the substation, they found bullet holes in multiple pieces of equipment, at which time they notified law enforcement. Law enforcement officers from the WCSO responded to the substation. The substation is enclosed by a barbed-wire fence approximately eight feet high. Outside the fence line, law enforcement recovered approximately five empty .450 Bushmaster cartridge cases. Law enforcement also determined that approximately fifteen bullets penetrated and damaged substation transformers and numerous electrical apparatuses. Outside the fence line of the substation, law enforcement observed a spray-painted symbol of an hourglass with a circle. Open source research indicated that this symbol was called, "The Extinction Symbol," and was widely used to represent the threat of climate change. As a result of the damage that the bullets caused to the substation, approximately 243 customers lost electrical service. Based on a preliminary assessment by the Mountrail-Williams Electric Cooperative, the damages caused by the attack are expected to be well in excess of $100,000.

7. During a canvass of the area surrounding the substation, law enforcement located a vehicle approximately one-half mile southeast of the substation in the middle of an agricultural field. The vehicle appeared to be stuck in the mud and was not occupied. The owner of the land on which the vehicle was located stated, in sum and substance, the following: the vehicle was not his; he did not know the registered owner of the vehicle; the vehicle was not there a few days ago when he seeded his farm; and he did not want the vehicle on his property. Law enforcement seized and entered the abandoned vehicle in an attempt to identify the owner and remove the vehicle from the property. Inside the vehicle, law enforcement located, among other items, a pill bottle, medical paperwork bearing the name Cameron Smith, and a black rifle case. After seeing evidence in the vehicle that appeared to be related to the substation attack, law enforcement discontinued the search of the vehicle and applied for a search warrant through the Williams County State's Attorney's Office. Law enforcement later executed the search warrant and completed its search of the vehicle.

8. Law enforcement made contact with a tow truck driver (the "Tow Truck Driver") in an attempt to remove the vehicle from the property. The Tow Truck Driver informed law enforcement that, at approximately 9:45 am on May 13, 2023, the Tow Truck Driver had responded to 119th Street Northwest, which was approximately one and one-half miles east of the location of the abandoned vehicle to pick up an individual (later identified as Smith, as detailed further below) who needed assistance. The Tow Truck Driver drove Smith to 121st Avenue Northwest, approximately one-half mile south of the substation, where Smith walked east of the roadway to a vehicle stuck in a field. Smith entered the vehicle, removed two duffel bags and a collapsible wheeled cart, then returned to the tow truck with those items. The Tow Truck Driver drove Smith to a local hotel in Williston, North Dakota, and the driver left Smith at the hotel. A

4

few hours later, the Tow Truck Driver received a phone call from Smith from a restricted number. Smith asked for assistance in recovering his vehicle from the field. The Tow Truck Driver stated that he would only assist Smith if Smith provided the Tow Truck Driver with Smith's name and telephone number. Smith provided the Tow Truck Driver with the name "Cam Smith" and a telephone number with a 647 area code (the "647 Cellphone").

9. Law enforcement responded to the hotel and made contact with hotel staff. Hotel staff indicated they had a guest obtain a room at the hotel earlier that morning under the name Cameron Smith and provided law enforcement with a copy of Smith's Canadian passport, as well as a copy of Smith's guest registration, on which Smith provided the hotel with the 647 Cellphone.

10. Law Enforcement obtained and executed a search warrant for Smith's hotel room and person through the Williams County State's Attorney's Office. Smith was detained and transported to the Williams County Correctional Center on suspicion of Criminal Mischief. Law enforcement located two identification cards inside Smith's hotel room with the name "Cameron Smith" on each identification card. Law enforcement also seized a blue in color GATEWAY GWTC116-2BL laptop, a black in color with a leather case WINDOWS TABLET, and a wallet containing two SIM cards.

11. Due to adverse weather conditions, mainly, heavy rain, law enforcement executed the search warrant for the vehicle recovered in the field at the Williams County Sheriff's Office Cold Storage garage. Inside the vehicle, among other items, law enforcement located approximately 166 live rounds of .450 Bushmaster ammunition and two muddy shoes. Law enforcement also seized a GARMIN ETREX 22x Global Positioning System and a SAMSUNG TABLET.

12. On May 14, 2023, law enforcement was able to review the hotel's security camera footage to determine that Smith departed the hotel at approximately 11:50 am on May 13, 2023, carrying two duffel bags and a collapsible wheeled cart. One bag appeared to be grey in color with a red zipper, and the other bag appeared to be green and blue in color. Law enforcement continued reviewing security camera footage from businesses in the area of the hotel to track Smith's movements. Smith was seen pacing around the parking lot and surrounding property of a local business in Williston, North Dakota. At approximately 12:50 pm, Smith was seen on security camera footage walking west on 42nd Street, away from the local business, carrying the duffel bags and collapsible wheeled cart. Smith left the view of the security cameras at approximately 12:57 pm, at which time he can be seen walking east on 42nd Street, towards the same local business, but he was not carrying the duffel bags. Law enforcement canvassed the area surrounding the local business. Law enforcement later obtained additional security camera footage showing Smith walking east on 42nd Street on the north side of an apartment building. Smith can be seen turning south into the eastern-most parking lot of the apartment building—between an apartment building and a row of garage buildings.

13. Law enforcement located a dumpster on the property of the apartment building and accessible by the public. The dumpster was located directly south of the northeastern-most garage building. Inside the dumpster, law enforcement located a grey REI-brand duffel bag with a red zipper and a green and blue duffel bag. Both bags located in the dumpster matched the description of the bags that Smith was seen carrying on the hotel's security camera footage. Inside the grey duffel bag, law enforcement located a black .450 Bushmaster rifle bearing serial number BK5091719 and two live rounds of .450 Bushmaster ammunition. Inside the green and blue duffel bag, law enforcement located sixteen .450 Bushmaster rifle magazines,

approximately 135 live rounds of .450 Bushmaster ammunition, a 9mm Sig Sauer pistol bearing serial number 58C012701, four pistol magazines for the Sig Sauer pistol, and approximately 104 live rounds of 9mm ammunition.

14. Law enforcement conducted an additional canvas of the area in which Smith's vehicle was recovered. Law enforcement located tire tracks through the fields between 119th Avenue Northwest and the location in which Smith's vehicle was recovered. Law enforcement also located footprints on the ground between where Smith's vehicle was recovered and 119th Avenue Northwest, indicating an eastern direction of travel, towards 119th Avenue Northwest.

15. On May 15, 2023, an FBI Special Agent spoke via telephone with a Deportation Officer from the United States Immigration and Customs Enforcement ("Officer-1"). Officer-1 attempted to perform an immigration inspection of Smith. During the immigration inspection of Smith, Smith admitted that he and his parents are citizens of Canada. Smith refused to say when he last entered the United States. Officer-1 queried databases and found no evidence that Smith had legally entered the United States since last departing the United States in 2018, in which he traveled from Portland, Oregon, to Vancouver, British Columbia, Canada, via Amtrack train. Officer-1 also found no evidence that Smith had any applications or petitions pending or approved before the United States Citizenship and Immigration Services, or that Smith had applied for a visa through the United States Department of Homeland Security to enter the United States legally. Immigration officials have placed a detainer on Smith alleging that he is removable due to his status as unlawfully present in the United States.

16. From training and experience, I know that the PROVIDER's retention period for tower dump information is over a year and as such there was not a necessity to send a preservation request to the PROVIDER.

17. From training and experience, I know that the PROVIDER keeps certain types of data, particularly, precision location data, referred to as NELOS or LOCDBOR. Precision location data are business records kept by the PROVIDER, which generate location event data via probes on the mobile network. Specifically, the PROVIDER determines an estimated location based on proprietary algorithms developed by the PROVIDER's research. The PROVIDER also keeps records for any time that a mobile device makes a direct communication with the PROVIDER's network such as voice, SMS (text), and data sessions for mobile devices. These records will show the IMSI, which is unique to the SIM card, and the IMEI, which is unique to the device such as phone or tablet.

18. Law enforcement has learned that Smith uses a telephone number with a 647 area code. That phone was not recovered from either the crime scene, hotel room, or vehicle.

19. From training and experience, I know that individuals generally carry one or more cell phones with them on their person. I know that it is a common practice for individuals engaging in criminal activity to throw phones away, buy new phones, or buy new SIM cards to put into phones, all to avoid detection by law enforcement. Since multiple SIM cards were found in Smith's wallet from the hotel room, there is probable cause to believe that Smith has, or at some point had a cell phone.  Additionally, the tablets recovered from Smith's vehicle and hotel room have the capability of connecting to wireless or cellular networks and have unique identifiers, further described below.

20. The National Domestic Communications Assistance Center (NDCAC) is a partnership between the FBI and federal, state, and local law enforcement. The purpose of NDCAC is to assist with technology and knowledge regarding communication services, technologies, and electronic surveillance. NDCAC has a portal that law enforcement officers can

access. One of the functions of the portal is called the cell site database. With the cell site database, law enforcement officers can input a point of interest, namely the crime scene, and select a provider to view the towers within a certain radius of the crime scene.

21. Your Affiant performed a lookup of the towers serving the address of the crime scene, 6381 121st Ave NW, Ray, North Dakota, 58849. Using a search radius of 10 miles, multiple cell towers associated with Verizon, AT&T, and T-Mobile were in the area.

22. I know from training and experience that based on the geography of the area around the crime scene, namely rural, flat, and without significant tree or building cover, it is possible for a cell site in North Dakota to provide service to a phone located up to 10 miles from a cell tower. I personally have analyzed historical cell site records and observed connections with estimated timing advance distances of up to 22 miles.

23. Law enforcement expects that throughout the course of the investigation, new unique identifiers such as phone numbers and unique devices will be associated with Smith. Having all of the connected devices within the specific timeframe and specific area where there is probable cause to believe Smith committed the criminal activity will allow investigators to continuously check for presence of those devices in the data.

24. The information requested by this warrant is not intended to be over broad or to cause an undue invasion of privacy. Attachment A requests a 4-hour time frame, in a rural area, in the middle of the night. The information will not contain any content of communications or any names of subscribers to specific phone numbers. The information will provide law enforcement with a repository of all of the electronic devices in the area with the capability to connect to a cellular network. If the investigation reveals that Smith was working with any other

individuals that were in the area at the time of the crime, those devices would also be captured by the tower dump information.

25. In my training and experience, I have learned that PROVIDER is a company that provides cellular communications service to the general public. In order to provide this service, many cellular service providers maintain antenna towers ("cell towers") that serve and provide cellular service to devices that are within range of the tower's signals. Each cell tower receives signals from wireless devices, such as cellular phones, in its general vicinity. By communicating with a cell tower, a wireless device can transmit and receive communications, such as phone calls, text messages, and other data. When sending or receiving communications, a cellular device does not always utilize the cell tower that is closest to it.

26. Based upon my training and experience, I also know that each cellular device is identified by one or more unique identifiers. For example, with respect to a cellular phone, the phone will be assigned both a unique telephone number but also one or more other identifiers such as an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), an International Mobile Equipment Identity ("IMEI"), a Subscription Permanent Identifier ("SUPI"), and/or a Network Access Identifier ("NAI"). The types of identifiers assigned to a given cellular device are dependent on the device and the cellular network on which it operates.

27. Based on my training and experience, I know that cellular providers, such as the PROVIDER, routinely and in their regular course of business maintain historical records that allow them to determine which wireless devices used cellular towers on the cellular provider's

network to send or receive communications. For each communication sent or received via the wireless provider's network, these records may include: (1) the telephone call number and unique identifiers of the wireless device that connected to the provider's cellular tower and sent or received the communication ("the locally served wireless device"); (2) the cellular tower(s) on the provider's network, as well as the "sector" (i.e., face of the tower), to which the locally served wireless device connected when sending or receiving the communication; and (3) the date, time, and duration of the communication.

28. In my training and experience, I am aware that PROVIDER possesses the capability to conduct a search of a predefined area and produce a record which identifies all mobile devices where a derived latitude and longitude coordinate falls within the search area.

29. Based on my training and experience and the above facts, information obtained from cellular service providers such as PROVIDER that reveals which devices used a particular cell tower (and, where applicable, sector) to engage in particular communications can be used to show that such devices were in the general vicinity of the cell tower at the time the communication occurred. Thus, the records described in Attachment A will identify the cellular devices that were in the vicinity of the location further identified in Attachment A, specifically, 6381 121st Ave NW, Ray, North Dakota, 58849, for the time period of 5/12/2023, 10:00 PM through 5/13/2023, 02:00 AM CDT. This information, in turn, will assist law enforcement in determining which person(s) were present at the target location during the timeframes specified in Attachment A.

30. The government will utilize various methods to analyze the data produced by PROVIDER in an effort to isolate mobile devices of interest while attempting to mitigate any undue invasion of privacy to innocent third parties. These analysis techniques include

identifying devices that are common to two or more locations, isolating devices that are unique to an area specific to the date and time of the crime, or other methodologies in an effort to identify the device or devices which correspond to the known fact patterns of the investigation.

## CONCLUSION

31. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices described in Attachment A to seek the items described in Attachment B.

Respectfully Submitted,

_____
Randy Larkin
Special Agent
Federal Bureau of Investigation

SWORN TO AND SUBSCRIBED BEFORE ME THIS 26th DAY OF May, 2023.

_____
HONORABLE CLARE R. HOCHHALTER
United States Magistrate Judge